IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

FILED
FEB 25 2025
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF OHIO
CLEVELAND

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | **I N F O R M A T I O N** |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | CASE NO. **5 : 25 CR 00070** |
| ) | Title 18, United States Code, |
| VALL ILIEV, ) | Sections 371, 545, 1349 and |
| VALLMAR STUDIOS, LLC, ) | 2320(a)(1) |
| SHOTSTOP BALLISTICS, LLC, ) | |
| ) | **JUDGE NUGENT** |
| Defendants. ) | |

## GENERAL ALLEGATIONS

1.  At all times relevant to this Information, VALL ILIEV ("ILIEV") was a resident of the State of Ohio and lived and was employed exclusively within the Northern District of Ohio, Eastern Division.

### VALLMAR, SHOTSTOP AND DOMESTIC COMPANIES

2.  At all times relevant to this Information, ILIEV was married to the owner of VALLMAR STUDIOS, LLC, ("VALLMAR") which operated at 1100 Campus Drive, #200, Stow, Ohio, in the Northern District of Ohio.

3.  At all times relevant to the Information, VALLMAR also received shipments, business documents and used as a business address 4319 and 4323 Lorwood Drive, Stow, Ohio, in the Northern District of Ohio. Both addresses were in a duplex owned and controlled by ILIEV.

4.  At all times relevant to the Information, VALLMAR used the web domain vallmar.com and accessed and maintained the content on that domain from computers located at

1100 Campus Drive, #200 and #300, Stow, Ohio, and 4319 and 4323 Lorwood Drive, Stow, Ohio.

5. At all times relevant to the Information, ILIEV was the majority owner and President of SHOTSTOP BALLISTICS, LLC, ("SHOTSTOP"), which operated at 1100 Campus Drive, #300, Stow, Ohio, in the Northern District of Ohio.

6. At all times relevant to the Information, SHOTSTOP used the web domains shotstop.com and shotstop.net to accept orders and process payments and accessed those domains from computers located at 1100 Campus Drive, #200 and #300, Stow, Ohio, and 4319 and 4323 Lorwood Drive, Stow, Ohio.

7. At all times relevant to the Information, imported shipments of body armor were received at 1100 Campus Drive, #200, Stow, Ohio and 4319 and 4323 Lorwood Drive, Stow, Ohio by VALLMAR.

8. At all times relevant to the Information, SHOTSTOP purchased all the body armor it sold to clients from VALLMAR.

9. At all times relevant to the Information, SHOTSTOP sold to the public Level III and Level IV body armor with labels stating the body armor was "Made in Stow, Ohio" and was "NIJ certified."

## FOREIGN CO-CONSPIRATORS OF VALL ILIEV, VALLMAR AND SHOTSTOP

10. At all times relevant to the Information, Company 1, an unindicted co-conspirator, (Co-Conspirator 1), whose identity is known to the United States Attorney, was solely based in the People's Republic of China ("PRC") and conducted all manufacturing, banking and shipping activities from within the PRC.

11. Co-Conspirator 1 also served as a broker within the PRC for contracting with manufacturers and shippers of ballistic plates for ILIEV, VALLMAR and SHOTSTOP.

12. At all times relevant to the Information, Company 2, (Co-Conspirator 2), an unindicted co-conspirator whose identity is known to the United States Attorney, was solely based in the PRC and conducted all manufacturing, banking and shipping activities from within the PRC.

13. At all times relevant to the Information, Company 3, (Co-Conspirator 3), an unindicted co-conspirator whose identity is known to the United States Attorney, was solely based in the PRC and conducted all manufacturing, banking and shipping activities from within the PRC.

14. At all times relevant to the Information, Company 4, (Co-Conspirator 4), an unindicted co-conspirator whose identity is known to the United States Attorney, was solely based in the PRC and conducted all manufacturing, banking and shipping activities from within the PRC.

## BACKGROUND OF NIJ CERTIFICATION

15. The NIJ was a component office of the Department of Justice, which tested and certified the functionality of body armor. Through a standardized and controlled process during which rounds of ammunition were fired at a standard distance, body armor was certified at certain levels. This testing and certification were performed at only three designated laboratories in the United States, and certification holders were required to submit their products for testing and review.

16. The testing process for a ballistic plate was to fire commonly used calibers of ammunition at ballistic plates and record how much penetration they achieve. Depending on the

depth of penetration, degree of distortion, or resulting loss of material integrity, a ballistic plate was certified as passing or failing NIJ standards.

17. If body armor met the standards for certification, the manufacturer and distributor were permitted to use a trademarked symbol and approved description of that certification on the product. Only products certified through NIJ testing were permitted to use the NIJ certification symbols, and the products could only state that they were certified for those tests they passed.

18. In addition to passing a ballistics test, NIJ certification was also dependent upon the filing and review of technical documentation explaining the manufacturing and finishing process for body armor.

19. NIJ certification of the technical manufacturing specifications required that the processes and procedures set forth in the specifications were followed without deviation and that all products were manufactured in accordance with the specifications submitted to the NIJ.

20. At all times relevant to the Information, VALLMAR and SHOTSTOP held NIJ certification to manufacture Level III and Level IV body armor. According to paperwork submitted by VALL ILIEV, the Level III and Level IV body armor produced by VALLMAR and SHOTSTOP would be manufactured in Stow, Ohio.

## COUNT 1
(Conspiracy to Smuggle Goods Into the United States, 18 U.S.C. § 371)

The United States Attorney charges:

21. Paragraphs 1 through 20 of this Information are realleged and incorporated as if fully set forth herein.

22. From on or about as early as October 2, 2017, continuing through on or about October 18, 2023, in the Northern District of Ohio and elsewhere, Defendants VALL ILIEV, VALLMAR STUDIOS, SHOTSTOP BALLISTICS, and other co-conspirators, including but not

limited to Companies 1, 2, 3 and 4, known and unknown to the United States Attorney, did knowingly and intentionally combine, conspire, confederate and agree to violate the laws of the United States, namely: by knowingly and fraudulently conspiring to import from the People's Republic of China to the United States of America uncertified body armor later proven to be defective with the intent to sell the items to customers in the United States as properly certified Level III and Level IV body armor, in violation of Title 18, United States Code, Section 2320(a)(1), which was a law of the United States, in violation of Title 18, United States Code, Section 545.

### Objects of the Conspiracy

23. It was an object of the conspiracy for ILIEV to use VALLMAR as a company that was permitted to manufacture Level III and Level IV body armor for sale in the United States for profit.

24. It was a further object of the conspiracy that ILIEV imported sub-standard Level III and Level IV body armor manufactured by Co-Conspirators 1, 2, 3 and 4 in the PRC that was later proven to be defective with the intent to sell it in the United States at a higher profit margin than could be earned by selling Level III and Level IV body armor manufactured in the United States.

25. It was a further object of the conspiracy that ILIEV imported fully manufactured Level III and Level IV body armor produced in the PRC by Co-Conspirators 1, 2, 3, and 4 that was later proven to be defective to VALLMAR STUDIOS in Stow, Ohio.

26. It was a further object of the conspiracy that ILIEV sold the imported Level III and Level IV body armor that was later proven to be defective received by VALLMAR to

SHOTSTOP for a price greater than what VALLMAR paid for it from Co-Conspirators 1, 2, 3 and 4.

27. It was a further object of the conspiracy that ILIEV used SHOTSTOP to sell imported Level III and Level IV body armor in the United States that was later proven to be defective under the false representations that it was made in the United States, and in a manner approved by the NIJ's certification procedures, at a price greater than what ILIEV paid for it from Co-Conspirators 1, 2, 3 and 4, thereby realizing a profit margin greater than if VALLMAR or SHOTSTOP manufactured the body armor domestically.

**Manner and Means**

28. It was part of the conspiracy that:

a. Defendant ILIEV obtained NIJ certifications to manufacture Level III and Level IV body armor in his name and the names of "VALLMAR STUDIOS" and "SHOTSTOP BALLISTICS."

b. Defendant ILIEV provided the NIJ with detailed specifications for the production and manufacture of body armor at a facility owned or controlled by VALLMAR and SHOT SHOP in Stow, Ohio, pursuant to NIJ certification regulations that required detailed manufacturing instructions and locations of that manufacturing.

c. Defendant ILIEV entered into business relationships with Co-Conspirators 1, 2, 3, and 4, all of whom manufactured and shipped body armor exclusively in the PRC.

d. Defendant ILIEV regularly sent patents, detailed NIJ specifications and manufacturing instructions to Co-Conspirators 1, 2, 3, and 4 via email concerning the finish or quality of body armor produced in the PRC and imported by VALLMAR.

e. ILIEV maintained regular contact with Co-Conspirators 1, 2, 3, and 4 via email to place orders via purchase orders and pay for purchase orders using pro forma invoices and international banking facilities.

f. ILIEV and Co-Conspirators 1, 2, 3, and 4 used a technique known as "Master Carton Smuggling," in which goods, in this case, Level III and Level IV body armor, were packed in a box and sealed with a pre-purchased shipping label.

g. For the benefit of, and pursuant to the shipping arrangement with, ILIEV, the box was then packaged within a larger container that had shipping information for shipment from, in this case, the PRC, to a location in the United States controlled by the original shippers.

h. Using this technique, the shipping documents listed the contents of the shipment in a manner meant to hide the true contents of the shipment and their destination.

i. Using this technique, once the container reached its first domestic destination, the interior box was forwarded to its ultimate domestic location using the pre-affixed and paid shipping label.

j. Using this method, ILIEV accepted shipments of Chinese-produced Level III and Level IV body armor to VALLMAR and 4319 and 4323 Lorwood Drive, Stow, Ohio.

k. Once the Chinese-made body armor was received, ILIEV and employees of VALLMAR or SHOTSTOP would affix labels stating "NIJ certified" and "Made in Stow, Ohio" on the individual plates prior to sale to law enforcement and the public.

### Overt Acts

29. In furtherance of the conspiracy, and to effect the objects and conceal the existence thereof, Defendants VALL ILIEV, VALLMAR STUDIOS, SHOTSTOP BALLISTICS

and Co-Conspirators 1, 2, 3, and 4, performed overt acts in the Northern District of Ohio and elsewhere, including, but not limited to, the following:

30. On or about May 29, 2023, ILIEV and VALLMAR caused a shipment addressed to VALLMAR, 1100 Campus Drive, #200, Stow, Ohio, to enter the United States

31. On or about May 29, 2023, VALLMAR and Co-Conspirators 1, 2, 3 and 4 caused the shipment of 200 fully finished plates of body armor to be characterized on the bill of lading to read "p.e. plates."

32. On or about October 18, 2023, ILIEV possessed thousands of body armor plates manufactured in the PRC at VALLMAR.

33. On or about October 18, 2023, VALLMAR or SHOTSTOP were housed in warehouses that only received, but had no means of producing, Level III or Level IV body armor.

34. On or about October 18, 2023, ILIEV, VALLMAR and SHOTSTOP possessed only a laser printer for printing certification labels that could be used in the fraudulent marketing of the body armor that was later proven to be defective.

35. On or about October 18, 2023, ILIEV possessed invoices, bills of lading, and emails and other business documents between ILIEV and Co-Conspirators 1, 2, 3, and 4 concerning the production, quality control oversight, purchase, payment and shipping of body armor produced exclusively in the PRC. The date of these documents and communications ranged from as early as on or about October 2, 2017, through October 18, 2023.

All in violation of Title 18, United States Code, Section 371.

## COUNT 2
(Conspiracy to Traffic in Counterfeit Goods, 18 U.S.C. § 2320(a)(1))

The United States Attorney further charges:

36. Paragraphs 1 through 20 and 28 through 35 of this Information are realleged and incorporated as if fully set forth herein.

37. From as early as on or about October 2, 2017, through on or about October 18, 2023, in the Northern District of Ohio, Defendants VALL ILIEV, VALLMAR and SHOTSTOP, and Companies 1, 2, 3, and 4, did intentionally traffic, and conspire with and between each other to traffic in goods, specifically Chinese-made body armor, by knowingly using a counterfeit mark, namely labels representing "NIJ certification," and stating the place of manufacture as "Stow, Ohio," on and in connection with such goods, in violation of 18 U.S.C. § 2320(a)(1).

### Objects of the Conspiracy

38. It was an object of the conspiracy for ILIEV to use VALLMAR and SHOTSTOP as companies that were permitted to produce Level III and Level IV body armor for sale in the United States for profit.

39. It was a further object of the conspiracy that ILIEV imported Level III and Level IV body armor produced and shipped by Co-Conspirators 1, 2, 3 and 4 in the PRC with the intent to sell it in the United States at a higher margin of profit than Level III and Level IV body armor that could have been produced in the United States.

40. It was further object of the conspiracy that ILIEV imported fully manufactured and shipped Level III and Level IV body armor produced in the PRC by Co-Conspirators 1, 2, 3, and 4 to VALLMAR in Stow, Ohio.

41. It was a further object of the conspiracy that ILIEV sold the Chinese-made Level III and Level IV body armor received by VALLMAR to SHOTSTOP for a price greater than what VALLMAR STUDIOS paid for it from Co-Conspirators 1, 2, 3 and 4.

42. It was a further object of the conspiracy that ILIEV used SHOTSTOP to sell Level III and Level IV body armor in the United States under the representation that it was made in the United States, and in a manner approved by the NIJ's certification procedures, at a price much greater than what ILIEV paid for it from Chinese manufacturers, thereby realizing a margin of profit far greater than if VALLMAR or SHOTSTOP manufactured the body armor domestically.

## Manner and Means

43. It was part of the conspiracy that:

    a. Defendant ILIEV obtained NIJ certifications to produce Level III and Level IV body armor in his name and the names of VALLMAR and SHOTSTOP, respectively.

    b. Defendant ILIEV provided the NIJ with detailed specifications for the production and manufacturing body armor at a facility owned or controlled by VALLMAR and SHOT SHOP in Stow, Ohio, pursuant to NIJ certification regulations that required detailed manufacturing instructions and locations of that manufacturing.

    c. Defendant ILIEV entered into business relationships with Co-Conspirators 1, 2, 3, and 4, all of whom manufactured body armor produced exclusively in the PRC.

    d. Defendant ILIEV regularly sent patents, detailed NIJ specifications and manufacturing instructions to Co-Conspirators 1, 2, 3, and 4 via email concerning the finish or quality of body armor produced in the PRC and imported by VALLMAR.

  e. ILIEV maintained regular contact with Co-Conspirators 1, 2, 3, and 4 via email to placed orders via purchase orders, paid for purchase orders using pro forma invoices and international banking facilities.

  f. ILIEV accepted shipments of Chinese-produced Level III and Level IV body armor to VALLMAR and 4319 and 4323 Lorwood Drive, Stow, Ohio.

  g. Once the Chinese-made body armor was received, ILIEV and employees of VALLMAR or SHOTSTOP would affix labels stating "NIJ certified" and "Made in Stow, Ohio," on the individual plates prior to sale to law enforcement and the public.

## Acts in Furtherance of the Conspiracy

44. In furtherance of the conspiracy, and to effect the objects and conceal the existence thereof, Defendants ILIEV, VALLMAR, SHOTSTOP performed the following acts, and those acts previously alleged in Paragraphs 1 through 20 and 28 through 35, and incorporated herein, in the Northern District of Ohio, and elsewhere:

45. On or about October 18, 2023, marketing videos and advertising materials produced by ILIEV, VALLMAR and SHOTSTOP were observed touting the fact that all body armor sold by SHOTSTOP was "Made in Stow, Ohio," and "NIJ certified." The NIJ certifications also included fictitious "patent pending" marks and certifications for, on certain products "Level III+" and "Level IV+HD" certified, neither of which designations exist.

46. On or about October 18, 2023, ILIEV, VALLMAR, and SHOTSTOP maintained electronic records of sales invoices to numerous law enforcement agencies in the United States and elsewhere, these records began as early as October 2, 2017, and were dated for transactions up and until October 18, 2023, and were for body armor represented to be "Made in Stow, Ohio" and "NIJ certified."

47. On or about October 18, 2023, ILIEV was in possession and control of printing devices used to print counterfeit and fictitious labels which were applied to Chinese-made body armor. The marking of "NIJ certified" was designed in such a way to confuse the consumer of the true quality of the body armor; likewise, the term "Made in Stow, Ohio," was designed to mislead and confuse consumers, and regulatory government officials, of the true place of manufacture.

48. On or about July 15, 2019, ILIEV, during a meeting with employees of VALLMAR and SHOTSTOP, knowingly and fraudulently misrepresented the location of the manufacture of body armor labeled and sold by SHOTSTOP as "Made in Stow, Ohio," in order to encourage employees to find investors and clients.

49. None of the plates contained in the packaging intercepted on or about May 29, 2023, contained NIJ certifications, nor did they have any indication that they were subjected to NIJ testing.

50. The body armor intercepted on May 29, 2023, stated their originating destination was the PRC.

All in violation of Title 18, United States Code, Section 2320(a)(1).

## COUNT 3
(Conspiracy to Commit Mail and Wire Fraud, 18 U.S.C. § 1349)

The United States Attorney further charges:

51. Paragraphs 1 through 20 of this Information are realleged and incorporated as if fully set forth herein.

52. From as early as on or about October 2, 2017, through October 18, 2023, in the Northern District of Ohio, Eastern Division, and elsewhere, Defendants VALL ILIEV, VALLMAR STUDIOS, SHOTSTOP BALLISTICS, and others known and unknown to the

United States Attorney did knowingly and intentionally combine, conspire, confederate and agree to devise, and intend to devise, a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representation, and promise, knowing that the pretenses, representation, and promises were false and fraudulent when made, and for the purpose of executing the scheme and artifice, to knowingly: cause matters to be placed in any post office and authorized depository for mail matter to be sent and delivered by the United States Postal Service and private and commercial interstate carrier, according to the directions thereon, in violation of Title 18, United States Code, Section 1341; and transmit and cause to be transmitted, by means of wire communication in interstate commerce, writings, signs, signals, pictures, and sounds, in violation of Title 18, United States Code, Section 1343.

### Objects of the Conspiracy

53. It was an object of the conspiracy for ILIEV to use VALLMAR and SHOTSTOP as companies that allegedly were permitted to produce Level III and Level IV body armor for sale in the United States for profit.

54. It was a further object of the conspiracy that ILIEV imported Level III and Level IV body armor produced and shipped by Co-Conspirators 1, 2, 3 and 4 in the PRC with the intent to sell it in the United States at a higher margin of profit than Level III and Level IV body armor that could have been produced in the United States.

55. It was a further object of the conspiracy that ILIEV used SHOTSTOP to sell Level III and Level IV body armor in the United States under the representation that it was made in the United States, and in a manner approved by the NIJ's certification procedures, at a price much greater than what VALL ILIEV paid for it from Chinese manufacturers, Co-Conspirators 1,

2, 3 and 4, thereby realizing a margin of profit far greater than if VALLMAR or SHOTSTOP manufactured the body armor domestically.

## **Manner and Means**

56. It was part of the conspiracy that:

   a. Defendant ILIEV entered into business relationships with Co-Conspirators 1, 2, 3, and 4, all of whom manufactured body armor exclusively in the PRC.

   b. Defendant ILIEV regularly sent patents, detailed NIJ specifications and manufacturing instructions to Co-Conspirators 1, 2, 3, and 4 via email concerning the finish or quality of body armor produced in the PRC and imported by VALLMAR.

   c. ILIEV maintained regular contact with Co-Conspirators 1, 2, 3, and 4 via email to place orders via purchase orders, pay for purchase orders using pro forma invoices and international banking facilities.

   d. ILIEV accepted shipments via commercial delivery of Chinese-produced Level III and Level IV body armor to VALLMAR and 4319 and 4323 Lorwood Drive, Stow, Ohio.

## **Acts in Furtherance of the Conspiracy**

57. In furtherance of the conspiracy, and to effect the objects and conceal the existence thereof, Defendants ILIEV, VALLMAR, and SHOTSTOP performed the following acts, and those acts previously alleged in 1 through 20, 1 through 20, 28 through 35, and 43 through 50, in the Northern District of Ohio, and elsewhere:

58. From on or about October 2, 2017, through on or about October 18, 2023, ILIEV and SHOTSTOP used the internet to advertise, market and solicit orders for SHOTSTOP body armor.

59. From on or about October 2, 2017, through on or about October 18, 2023, ILIEV and SHOTSTOP accepted orders through a sales portal accessible on the internet and sent out completed orders through the United States mails using commercial delivery services.

60. On or about October 2, 2017, ILIEV received a call from a commercial delivery service requesting additional information about the content of packages containing body armor sent from the PRC destined for ILIEV.

61. On or about October 31, 2017, ILIEV received a call from a commercial delivery service requesting additional information about the content of packages containing body armor sent from the PRC destined for ILIEV.

62. On or about January 12, 2023, ILIEV received a call from a commercial delivery service requesting additional information about the content of packages containing body armor sent from the PRC destined for ILIEV.

63. On or about October 18, 2023, ILIEV maintained records of orders placed via email from Co-Conspirators 1, 2, 3, and 4 in the PRC for body armor plates dated from as early as on or about October 2, 2017, through October 17, 2023.

64. On or about October 18, 2023, ILIEV maintained records of materials sent via commercial carrier delivery services from Co-Conspirators 1, 2, 3, and 4 in the PRC to both 1100 Campus Drive, #200, Stow, Ohio and 4319 and 4323 Lorwood Drive, Stow, Ohio, for body armor plates dated from 2018 to October 17, 2023.

65. On or about October 18, 2023, ILIEV maintained records of orders placed via the Internet for body armor plates fraudulently labeled as "NIJ certified," and "Made in Stow, Ohio," dated from 2017 through 2023.

66. On or about October 18, 2023, ILIEV maintained records of orders of body armor fraudulently labeled as "NIJ certified," and "Made in Stow, Ohio," fulfilled to domestic clients from 2017 through October 18, 2023.

All in violation of Title 18, United States Code, Section 1349.

CAROL M. SKUTNIK
Acting United States Attorney

By: *[signature]*

DANIEL J. RIEDL
Chief, National Security and Cyber Unit